## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSEPH R. KARSNER, IV

    Petitioner

v.

MARY HARNAGE

and

FINRA

    Respondents

Civil Action No.: 1:07-CV-01579-RJL

### FINRA'S PARTIAL OPPOSITION
### TO PETITION TO CONFIRM ARBITRATION AWARD

Defendant, Financial Industry Regulatory Authority, Inc. ("FINRA"), respectfully files this response and partial opposition to the Petition to Confirm Arbitration Award.

FINRA only opposes that portion of plaintiff's Petition to Confirm Arbitration Award that calls for the immediate expungement from the Central Registration Depository ("CRD") of all references to the arbitration captioned, <u>Mary M. Harnage v. Legacy Financial Services, Inc. and Joseph R. Karsner,</u> Arbitration Case No. 04-07346.

FINRA requests that any order of expungement by this court be stayed pending the completion of a regulatory proceeding initiated by the State of Maryland against Mr. Karsner. The State of Maryland issued an Order to Show Cause against Mr. Joseph R. Karsner, IV on

2

March 19, 2007. [1]  The Order to Show Cause contains allegations involving, among other things, the same allegations at issue in this arbitration.

FINRA asks that this Court defer decision on the expungement relief requested in the Petition to Confirm Arbitration Award pending the conclusion of Maryland's regulatory proceeding.

Respectfully submitted,

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.

Dated: September 18, 2007         By: _____/s/_____
                                          Terri L. Reicher
                                          Financial Industry Regulatory Authority, Inc.
                                          1735 K Street, NW
                                          Washington, DC 20006
                                          (202) 728-8967

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2007, a copy of the foregoing was mailed by first class mail, postage prepaid, to:

William B. Young, Jr., Esq.
Colling, Gilbert, Wright & Carter
2301 Maitland Center Parkway, Suite 240
Maitland, Florida 32751

_____/s/_____
Jo Marie Donaldson

---

[1] See attached Exhibit 1, Administrative Proceeding Before the Maryland Securities Commissioner, <u>In the Matter of:</u> <u>Joseph R. Karsner, IV, Joe Karsner & Associates, LLC and Legacy Financial Services, Inc.</u>, File No. 2002-0391.

# Exhibit 1

ADMINISTRATIVE PROCEEDING
BEFORE THE
MARYLAND SECURITIES COMMISSIONER

IN THE MATTER OF:                              *

JOSEPH R. KARSNER, IV,                         *        File No. 2002-0391

JOE KARSNER & ASSOCIATES, LLC                  *

      and                             *

LEGACY FINANCIAL SERVICES, INC.,               *

    Respondents.                           *

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## ORDER TO SHOW CAUSE

WHEREAS, the Maryland Securities Commissioner (the "Commissioner"), pursuant to

the authority granted by Section 11-701 of the Maryland Securities Act, Corporations and

Associations Article, Title 11, Annotated Code of Maryland (1999 Repl. Vol. & 2006 Supp.) (the

"Securities Act") initiated an investigation into the activities of Joseph R. Karsner, IV

("Karsner"), a registered representative of Legacy Financial Services, Inc. ("Legacy"), and of

Karsner's sole proprietorship Joe Karsner & Associates, LLC ("JK & A"); and

WHEREAS, in the course of its investigation of Karsner, the Maryland Securities

Division ("Division") pursued an investigation of Legacy's supervisory practices; and

WHEREAS, on the basis of that investigation the Commissioner has determined that

respondent Karsner and JK & A may have sold unsuitable investments to his clients and in other

respects violated the Securities Act, and that respondent Legacy may have failed adequately to

supervise Karsner; and

NOW, THEREFORE, the Commissioner hereby orders respondents to show cause: why respondents should not be barred from engaging in the securities and investment advisory business in this State; why a civil monetary penalty should not be entered against each respondent; why a final order should not be entered ordering respondents to cease and desist from further violations of the Securities Act; and why respondents' registrations as broker-dealer and broker-dealer agent should not be suspended or revoked.

The Commissioner alleges the following as a basis for this Order:

## I. JURISDICTION

_____1.    The Commissioner has jurisdiction in this proceeding pursuant to Section 11-701.1 of the Securities Act.

## II. RESPONDENTS

2.    Karsner (CRD # 1001341) is a Maryland resident and maintains a place of business at 325 Gambrills Road, Suite B, Gambrills, Maryland 21054. Karsner became a registered representative of Legacy on April 2, 1999, but was terminated on January 5, 2006. He was registered through Signator Investors, Inc. (a.k.a. John Hancock Distributors, Inc.), an affiliate of John Hancock Life Insurance Company (collectively "Hancock"), between November 1981 and April 1999. He has passed the Series 6 exam and, therefore, may be licensed to sell mutual funds, but has never passed the Series 7 exam that would permit him to become a general securities representative. He is not registered as an investment adviser representative, but is a licensed insurance agent in Maryland. He is not currently registered to sell securities in any jurisdiction.

3.    Joe Karsner & Associates, LLC is a Maryland limited liability company formed in

2

April 1999. Its principal office is located at 325 Gambrills Road, Suite B, Gambrills, Maryland 21054.

4.    Legacy (CRD # 38697) is a California corporation organized in 1995. It is headquartered at 2090 Marina Avenue, Box 6030, Petaluma, CA 94955-6030. Legacy has been registered as a broker-dealer with the National Association of Securities Dealers, Inc. ("NASD") since December 1995 and in Maryland since January 1996.

### III. STATEMENT OF FACTS

Karsner's Business Practices

5.    Karsner operated a branch office of Legacy between September 23, 2002 and January 5, 2006, when he was terminated. Between April 2, 1999 and September 23, 2002, his office was an offsite location of Legacy.

6.    Karsner described his business "Joe Karsner and Associates" as a "retirement planning and investment organization that offers a number of investment vehicles to structure a portfolio that will meet your particular financial needs." He explained on his website provenretirement.com that he has "over 22 years experience in the retirement/investment/ insurance financial planning field."

7.    Karsner held out to the public as an investment adviser. His website used to describe Karsner as a "financial advisor." While he was affiliated with Legacy, the website stated that he "manages over $250 million in retirement accounts." It described Karsner's Proven Retirement Solution's twelve-step, three stage process, including the first stage in which he helped clients assess their current circumstances and set financial goals; the second stage in which he developed a retirement plan that would fit clients' particular situations; and the third

3

stage in which he implemented the retirement plan with investment products that would help achieve the clients' life-long goals.

8.    Karsner emphasized to his clients his close and continuing relationship. In effect, he assumed a continuing fiduciary duty to his clients. He regularly updated clients on the status of their accounts by sending them investment summaries. He also sent letters providing his analysis of the financial markets. He reiterated in these letters his continuing responsibility for his clients with such assurances as "my business has been built soley [sic] on the premise of establishing and maintaining long-term relationships with each and every one of you," "I will continue to work hard in getting you the returns you deserve," and "call us if you would like to set up an appointment to review your accounts or reassess your financial needs. I remain committed to taking care of you the way you deserve."

9.    Karsner's website posting explained that "under the guidance of our Broker/Dealer, Legacy Financial in Petaluma, CA, Joe Karsner and Associates is able to offer superior financial products and services." According to the website, Karsner had several others working with the firm of Joe Karsner and Associates.

10.    Up until at least May 23, 2003, Karsner described Rita Hampton ("Hampton") (CRD #2999338) as one of his Legacy staff members who "has worked in the investment/insurance business for over 17 years." Hampton, however, was not a registered representative of Legacy at that time. She was registered through Lifemark Securities Corp. ("Lifemark") from January 1998 until April 2002 and through Atlas Brokerage Company ("Atlas") from April 2002 until December 2002 and again from February 2003 until October 2003. She did not become registered in Maryland through Legacy until February 3, 2004. She

4

used business cards showing her affiliation with Joe Karsner & Associates providing "Investments & Insurance for Retirement Planning" and serving as a vice president, but not identifying any broker-dealer.

11.     While Hampton was registered first through Lifemark and then Atlas, she routinely assisted Karsner with his Legacy securities clients by accompanying Karsner to meet with clients and talking with them on the telephone. Sometimes, Hampton met with Legacy securities clients alone. For example, Shirley Locklair met *only* with Hampton, but signed a Legacy new account form ("NAF") and received statements from Karsner. Karsner included on client statements insurance products from companies where Hampton, but not Karsner, had appointments. Karsner advised his clients to talk with Hampton if they had questions. Hampton also wrote some Legacy clients concerning their Legacy investments.

12.     With the assistance of Hampton and the rest of his staff, Karsner handled more than eleven hundred clients as of June 2003. He earned more than $3.3 million in commissions between April 2, 1999 and June 5, 2003.

13.     Legacy paid Karsner a $125,000 signing bonus when he joined the firm. In exchange, Karsner agreed to provide Legacy with written confirmation from Hancock of its intention to transfer all customers and their invested capital to Legacy.

14.     When Karsner moved from Hancock to Legacy, Legacy arranged for a mass transfer of Karsner's clients. Clients did not individually request or authorize this transfer. Rather, the transfer was handled between the firms in about April 1999. On June 1, 1999, when Karsner expected the transfer to be complete, he wrote clients informing them that their accounts were being transferred to his new firm and asking them to advise him if a Hancock representative

5

should get in touch with them.

15.    Many of Karsner's clients are employees and former employees of the "telephone company," whether AT&T, Bell Atlantic or Verizon. Karsner holds or held seminars, sometimes on telephone company premises, targeting telephone company employees planning for retirement. He typically advised persons attending his seminars who were eligible for retirement to take a lump sum distribution rather than a guaranteed monthly pension because the lump sum distribution could provide for income as well as growth. He recommended that retirees invest the lump sum in a portfolio of mutual funds, variable annuities and other insurance products, and assured potential clients that they would be able to live off the investment income from their lump sum distribution for the rest of their lives.

16.    Karsner routinely gave seminar participants a packet of materials that would help them calculate the payments they could expect to obtain from their retirement portfolio. The materials contained a formula for calculating sustainable annual withdrawals, depending upon the size of the retirement distribution, the individual's age, life expectancy and estimated annual investment return. The packet included a selection of investment returns ranging from a low of 6% to a high of 12%. In the specific example that Karsner generally gave seminar participants, however, the estimated annual investment return was 8%. In some cases, Karsner handed out materials in which he guaranteed 12% return on variable annuities, 7% return on fixed annuities and 4.5% return in a money market account. The seminar materials contain no other discussion of the risks associated with the estimated return.

17.    When clients told Karsner how much income they needed or wanted to withdraw per month, he routinely assured them that he could provide that income. He did not discuss the

6

risks associated with obtaining higher levels of monthly income and assured them that they would be able to live on their principal and income until they died. In reliance on Karsner's reassurances, many of the seminar participants retired while still in their 50s, expecting to be able to live on the regular monthly income drawn from their retirement accounts managed by Karsner.

18.     Karsner explained the tax consequences of his retirement advice. He told his clients that if they withdrew regular income from their retirement accounts before the age of 59 ½ and complied with the provisions of Section 72(t) of the Internal Revenue Code, they would not suffer tax penalties. IRC Section 72(t) provides that a taxpayer must pay a 10% penalty for any distributions taken from a qualified retirement plan before the age of 59 ½ unless the distributions are part of a series of substantially equal periodic payments. Clients who relied upon IRC Section 72(t) were locked into their monthly withdrawals until the IRS modified the rules in October 2002 to allow for a one-time change to the distribution method.

19.     Internal Revenue Rulings implementing IRC Section 72(t) provide that the interest rate used to calculate the maximum permissible periodic payment be no more than 120% of the federal mid-term rate determined in accordance in § 1274(d). During the period after Karsner moved his business to Legacy, that rate could not exceed 6.35%. Karsner's sample calculation for the periodic payment, however, used a rate of 8%.

20.     Karsner generally advised his clients to purchase several mutual funds and to reserve a part of their portfolio in a money market account that could be used to fund regular monthly withdrawals, satisfying the requirements of IRC Section 72(t).

21.     Most of his clients were unsophisticated in financial matters and relied upon Karsner to make diversified investments in their accounts which would be safe and secure.

While Karsner was with Hancock, his client accounts were generally fairly conservatively invested in a diversified portfolio of mutual funds, including such funds as growth and income, large cap growth, bank and bond funds, and variable annuities with diversified mutual fund sub-accounts.

22.     When Karsner transferred from Hancock to Legacy in April 1999 and his clients were transferred to Legacy through a mass transfer, Karsner was unable to service the client accounts through Legacy because the accounts held proprietary Hancock products.  It took some time for Karsner to meet with his approximately 1000 clients after his move.  As he met with them, he advised his clients to sell the Hancock products and purchase products through Legacy.

23.     Karsner pursued a much riskier investment strategy after he joined Legacy. Karsner followed investment strategies that resulted in significant portions of client assets at Legacy being invested in technology, telecommunications, internet and small or medium cap growth funds.  As a result, clients' portfolios were invested in far riskier funds than they had been at Hancock.

24.     For example, in March 2000, Karsner instructed Hancock to change the mutual funds held in the sub-accounts of over 350 variable annuity clients from a diversified portfolio to a single sub-account holding a mid-cap fund.  He did not consult with clients before directing this transfer and did not have discretionary authority over the accounts.

25.     Karsner switched many other clients from Hancock mutual funds to Oppenheimer or American Skandia/Janus funds after he moved to Legacy.  When he met with clients to make these recommendations, he also had the clients sign Legacy new account forms, often changing the investment objectives and risk tolerance from their Hancock forms to coincide with the

8

characteristics of the riskier portfolios.

26.    Many of the mutual funds that Karsner recommended to his clients declined very substantially with the burst of the tech bubble beginning in the spring of 2000, frequently by significantly more than the S & P 500 because of their investments in risky securities and concentration in small to mid-cap firms and technology stock.

27.    After his clients' portfolios had substantially declined, Karsner sometimes advised clients to sell their homes, take in tenants, go back to work or stop drawing income. Indeed, many clients have been forced to return to work. This advice was in sharp contrast to his advice when they first came to him with their retirement funds and he assured them that they could live off the proceeds for the rest of their lives.

28.    Because Karsner's clients are generally retired from the telephone company and often were taking regular income withdrawals pursuant to IRC Section 72(t), they were locked into taking withdrawals even if the withdrawals came out of principal rather than stock appreciation and investment income. As a result of following Karsner's investment advice, the retirement portfolios for many of these clients have been decimated. For example, Roland and Linda R. invested about $840,000, withdrew about $242,400, and ended with about $302,000 as of August 2003, for an approximately 50% loss of their net investment.

29.    When clients questioned Karsner about the decline in their portfolios, he advised them not to sell because their losses were simply paper losses and they still held the shares. Even as their account balances were dwindling, Karsner sent letters to clients attributing the decline to September 11 and telling them to hold onto their funds because they were invested for the long run. In recognition of his bad investment advice, however, Karsner told clients that he would

9

rebalance their portfolios after fund prices returned to target levels. For example, he wrote one client that, when fund prices reached target levels, he would place half his Janus Capital Growth shares into American Century Strategic Balanced Fund, half the Oppenheimer MidCap Fund into Quest Balanced Value Fund and half the Neuberger Berman MidCap Fund into Pimco Total Return Bond Fund.

30.     Many of the mutual funds purchased on Karsner's advice were unsuitable. His strategy of investing in risky growth and small or mid cap funds was often devastating to retirees without a source of employment income. The bitter result was often that clients lost a substantial part or even the entire value of their retirement portfolios.

31.     NAFs are designed to provide guidance to a broker-dealer and its representatives for deciding which investments to recommend to customers. Legacy's NAFs require background financial information that "must be completed for all accounts." One section requests the client's net assets and income; a second asks the client to check all applicable investment objectives; and a third asks whether the client's risk tolerance is high, medium or low. Hancock's NAF contains a similar list of possible investment objectives, including safety of principal. The NAF should form the basis for Karsner's recommendations to his clients and allow Legacy to review those recommendations for suitability.

32.     Many of Karsner's clients have multiple NAFs with inconsistent objectives or risk tolerance. Sometimes, clients have more than one NAF with different objectives or risk tolerance on the same day.

33.     Karsner appears to have completed the NAF sections showing the clients' risk tolerance and investment objectives. Many clients claim that they never discussed with him their

10

willingness to expose their retirement funds to risk. Sometimes, the risk tolerance or investment objectives section of the NAF is blank. Where there are two NAFs on the same date, with one partly blank, it appears that Karsner may have completed the form after the client signed. Other times, the client signatures appear to have been forged or copied.

34.    Karsner had a practice of having his clients sign a new account form for each new investment product. In effect, he made sure that the investment objectives and risk tolerance in the new account form were consistent with the investment product that he sold, rather than with the client's overall investment objectives and risk tolerance.

35.    Many client NAFs have not been approved or signed by a Legacy supervisor. It appears that, even when a supervisor signed the form, Legacy did not question why Karsner's clients signed so many NAFs within a short period of time or even on the same day, why the clients' risk profiles and investment objectives changed, and whether the risk profiles were appropriate for clients' retirement funds.

36.    Many investment applications completed when clients switched from one mutual fund to another are, also, incomplete. Clients did not always sign the applications or initial required items of disclosure. Often, sections were completed by typewriter before the client saw the application.

37.    Karsner routinely told his clients that they paid no fees because of the large volume of his business. Seminar materials state "no sales charges on either front or back end." When clients sold interests in mutual funds, however, they sometimes incurred contingent deferred sales charges on the sale of their Class B mutual funds.

38.    Karsner reimbursed some clients when they incurred unexpected fees. For

11

example, he reimbursed clients for various "administrative" fees, sales commissions or deferred sales charges. He reimbursed Elizabeth E. about $8,000 for unanticipated taxes, Helen and John A. for $2,500 in taxes resulting from an unauthorized transaction, and Vergie H. $23,000 for an unauthorized transaction. Karsner warned these clients not to talk with anyone else about the reimbursements.

Legacy's Supervisory Procedures

39.    Larry Qvistgaard, Vice President and Chief Compliance Officer of Legacy, supervised Karsner. According to CRD, he supervised Karsner's branch office until it officially closed on March 3, 2006. During the period April 2, 1999 through June 2002, Qvistgaard supervised approximately 103 registered representatives who had approximately 4,124 clients. Karsner alone had more than 1,000 clients. Qvistgaard had about 159 clients of his own.

40.    Qvistgaard, who served both as Chief Compliance Officer and as line supervisor for over 100 representatives, could not adequately supervise those for whom he was responsible while simultaneously ensuring that Legacy's supervisory procedures were adequate and properly implemented.

41.    According to Legacy, Karsner's office was not subject to an annual audit because it is a branch office. Legacy's Compliance Manual required that branch offices be audited at least every three years, but may be subject to more frequent inspections should the Office of Supervisory Jurisdiction become aware of anything that would warrant an inspection. Non-branch offices must be inspected as required by state law.

42.    Legacy has an obligation to monitor the securities-related activities of its agents and to detect and prevent regulatory and compliance problems of its associated persons, whether

the persons are working at branch or unregistered offices. In order to fulfill these obligations, Legacy must conduct periodic examinations of its agents' offices depending on such factors as the nature and volume of business conducted at the office and the nature and extent of contact with customers.

43.     The NASD Notice to Members 98-38 advises its members that it does not distinguish between branch offices and unregistered offices in its evaluation of the adequacy of compliance examinations and notes that a pre-announced compliance examination only once a year was inadequate to satisfy supervisory obligations of broker-dealer Royal Alliance.

44.     It appears that Legacy's first inspection of Karsner's office took place on December 3, 2001, more than two years after Karsner started with Legacy and before his office became a branch office. At that time, Qvistgaard conducted a two-hour audit of Karsner's office. The audit showed that Karsner conducted no seminars, although he had a history of soliciting clients through seminars, and made no deposits to client accounts, although Elizabeth E. filed a complaint before September 1, 2001, in which she alleged that Karsner had reimbursed her for the tax consequences of an improper trade. The audit also stated that outgoing correspondence was sent to Legacy's compliance department, although correspondence from Karsner to his clients shows that Hampton engaged in securities activities on behalf of Legacy without being registered through Legacy. The audit did not comment on the role played by Hampton in Joe Karsner & Associates, although Linda M. had complained in May 2001 about transactions allegedly executed by Hampton when she had dealt only with Karsner.

45.     Even though there had been numerous customer complaints and an active investigation by the Securities Division, Legacy did not audit Karsner's office again until July 1,

13

2003. The audit was announced. At that time, the auditor identified Qvistgaard as OSJ Manager and Karsner's office as a non-branch office, in spite of a branch office designation on CRD. The auditor noted that Karsner solicits customers through seminars and stated that Legacy has approved all Karsner's correspondence, seminar material and website. He also stated that Karsner had made no deposits to client accounts, but inconsistently noted the settlement of Elizabeth E.'s claim alleging that Karsner reimbursed her for taxes and rebated fees to other clients. The audit did not comment on any review of Karsner's bank records or on the role played by Hampton in Joe Karsner & Associates.

46.    Legacy did not maintain books and records that were adequate to properly supervise Karsner. It did not have records of the clients' portfolios brought over to Legacy from Hancock and could not determine whether there was a change in the riskiness of the portfolios when Karsner switched the clients from their proprietary Hancock products into other mutual funds. It did not maintain any computerized records of client portfolios or other records providing a statement of client accounts after Karsner switched the mutual fund holdings. Therefore, it could not evaluate the suitability of client investments. It had only the disclosure documents that Karsner completed and clients were supposed to sign when they purchased mutual funds. Often these forms were incomplete, unreviewed by supervisors and unsigned by the clients.

47.    Legacy's Compliance and Procedures Manual and OSJ Branch Office Policy and Procedures Manual prohibit various of Karsner's sales practices. For example, they require that:

a.    NAFs be completed in their entirety;

b.    Mutual fund applications be complete;

14

     c.     Registered representatives recommend switching of mutual fund families only in rare circumstances where there has been a clear change in the customer's investment objective and the investment objective of the new investment clearly meets the changed investment objective.

     d.     Registered representatives not guarantee the future value of any security;

     e.     All correspondence or other materials mailed or handed out at seminars to customers be approved;

     f.     Registered representatives not make gifts in excess of $100 to any customer; and

     g.     When a registered representative changes his broker-dealer registration to Legacy, the client complete and sign a change of broker-dealer form and the form be forwarded to Legacy together with a NAF.

     48.     Legacy's OSJ Branch Office Policy and Procedures Manual spells out supervisory procedures that Legacy has not met or for which proof of implementation has not been provided to the Securities Division:

     a.     NAFs must be reviewed for completeness;

     b.     NAFs must be signed by the OSJ Branch Manager;

     c.     Mutual fund applications must be reviewed for completeness;

     d.     All office personnel in a small office must be fingerprinted;

     e.     All correspondence by a registered representative must be approved;

     f.     All seminar material used by a registered representative must be approved;

     g.     A registered representative's personal bank disbursements must be reviewed to determine whether there have been checks payable to customers;

h.    All mutual fund liquidations must be reviewed to determine whether subsequent investments are suitable and whether appropriate disclosures, including switching letters, have been made; and

i.    All clients must complete and sign a change of broker-dealer form when a registered representative changes his broker-dealer registration to Legacy.

49.    Legacy was on notice at least since 2001 that Karsner worked with Hampton on securities matters and yet Legacy did not supervise her.  Karsner client Linda M. complained that Karsner sold her an annuity but that paperwork reflecting the transaction was executed by Hampton, whom the client did not know.  In addition, in a letter dated December 17, 2001, Legacy's Compliance Director recognized that client Shirley L. "met with Rita Hampton, an associate of Joe Karsner, to discuss your investments because you saw a decrease in your investment."  Yet Legacy took no action to ensure that Hampton stopped conducting business on behalf of Legacy or to supervise Hampton until February 2004, when Legacy hired Hampton as an agent.

50.    Legacy was on notice since no later than December 2001, that clients sometimes had multiple NAFs on the same date with contradictory objectives.  In a letter dated December 14, 2001, Legacy's Compliance Director wrote Denise M. that she had two NAFs signed in March 2000, one showing high risk tolerance with investment objectives of long term growth and capital appreciation and the other showing medium risk tolerance and investment objectives of long term growth, capital appreciation and income.  Yet Legacy did not question the appropriateness of these NAFs.

51.    Legacy ignored red flags relating to Karsner's sales practices, including multiple,

inconsistent and incomplete NAFs; incomplete mutual fund applications; website advertisements

in which Karsner holds out as an investment adviser; and indications on Karsner's website, in

correspondence, and in complaints that Karsner works with a person not registered through

Legacy. Even when client complaints raised serious concerns and red flags about Karsner's sales

practices, Legacy denied the complaints out of hand and failed to react to or correct the

challenged practices.

52.     Legacy's failure to respond adequately to red flags and customer complaints has

caused Legacy to violate the "know your customer" rule in that it failed to learn the essential

facts relative to those customers and ensure that their investments were suitable.

53.     Legacy has either not responded or responded only after repeated letters to

requests from the Division, including requests for client account records, copies of Karsner's

seminar materials, its review of the sale of Class A and Class B mutual funds, and explanations

concerning Legacy's supervisory practices and procedures.

## COUNT I
**(Acting as an Unregistered Investment Adviser or Investment Adviser Representative)**
**(Joe Karsner & Associates and Karsner)**

WHEREAS, an investment adviser means a person who, for compensation:

(1)     engages in the business of advising others, either directly or through publications
        or writing, as to the value of securities or as to the advisability of investing in,
        purchasing, or selling securities, or who, for compensation and as a part of a
        regular business, issues or promulgates analyses or reports concerning securities;
        or

(2)     1.     provides or offers to provide, directly or indirectly, financial and
               investment counseling or advice, on a group or individual basis;

        2.     gathers information relating to investments, establishes financial goals and
               objectives, processes and analyses the information gathered, and
               recommends a financial plan; or

17

3.    holds out as an investment adviser in any way, including indicating by advertisement, card, or letterhead, or in any other manner indicates that the person is, a financial or investment "planner", "counselor", "consultant", or any other similar type of adviser or consultant; and

WHEREAS, an investment adviser representative includes an individual who has a place of business in this State and is employed by or associated with a federal covered adviser and who

(1)    makes any recommendations or otherwise renders investment advice to clients;

(2)    manages accounts or portfolios of clients;

(3)    determines which recommendation or investment advice should be given with respect to a particular client account; or

(4)    holds out as an investment adviser; and

WHEREAS, Section 11-401 of the Securities Act makes it unlawful for any person to transact business in this State as an investment adviser or investment adviser representative unless the person is registered as an investment adviser or investment adviser representative and certain exceptions are not applicable; and

WHEREAS, the exceptions to the requirement that an investment adviser or investment adviser representative be registered are not applicable in this matter; and

WHEREAS, JK & A acted as an investment adviser and Karsner acted as an investment adviser representative by managing client portfolios, making recommendations and providing investment advice with regard to those portfolios and holding out as an investment adviser or investment adviser representative; and

WHEREAS, JK & A and Karsner have never been registered in this State as an investment adviser or investment adviser representative,

NOW, THEREFORE, IT IS HEREBY ORDERED that JK & A and Karsner show cause

18

why a final order should not be entered that orders them to cease and desist from engaging in

activities in violation of the Securities Act including Section 11-401, assesses a statutory penalty

of up to $5,000 per violation, permanently bars them from the securities and investment advisory

business in Maryland for or on behalf of others, or from acting as principal or consultant in any

entity so engaged, and orders any other sanction or combination of sanctions as permitted under

Section 11-701.1.

**COUNT II**
**(Fraud in Connection with the Offer or Sale of Securities, Section 11-301)**
**(Karsner)**

WHEREAS, Section 11-301 of the Securities Act makes it unlawful for any person, in

connection with the offer, sale or purchase of any security, directly or indirectly to:

    (1)    employ any device, scheme or artifice to defraud;

    (2)    make any untrue statement of a material fact or omit to
state a material fact necessary in order to make the
statements made, in light of the circumstances under which
they were made, not misleading; or

    (3)    engage in any act, practice or course of business which operates or would
operate as a fraud or deceit on any person; and

WHEREAS, Karsner omitted to state material facts, including but not limited to the

following facts related to the sale of mutual funds:

    (1)    That mutual funds he recommended to clients were risky;

    (2)    That mutual funds he recommended to clients were unsuitable in light of the
clients' investment objectives and risk tolerance; and

    (3)    That clients may incur various sales charges; and

    (4)    The basis for commissions he earned on the sale of mutual funds; and

WHEREAS, Karsner made material misrepresentations, including but not limited to the

19

following related to the sale of mutual funds:

    (1)    That clients could live off their retirement funds until they died and could earn a guaranteed 12% return on variable annuities, 7% return on fixed annuities and 4.5% return in a money market account;

    (2)    That clients would pay no front or back end load on the purchase or sale of mutual funds; and

    (3)    That clients do not pay his fees; and

WHEREAS, Karsner engaged in an act, practice or course of business which operates or operated as a fraud or deceit on his clients, including but not limited to:

    (1)    Transferring clients from Hancock to Legacy without their authorization;

    (2)    Switching clients from one portfolio of mutual funds to another portfolio in order to maintain control over the client's account after he moved to Legacy;

    (3)    Switching clients from one portfolio of mutual funds to another riskier portfolio;

    (4)    Completing multiple NAFs for clients without explaining to them the issues and changing their investment objectives and risk tolerance without adequate disclosure;

    (5)    Working on Legacy securities matters with a person who was not registered through Legacy; and

    (6)    Paying clients for costs they have incurred, including sales fees and commissions, unanticipated taxes and investment principal for unauthorized transactions,

NOW, THEREFORE, IT IS HEREBY ORDERED that Karsner show cause why a final

order should not be entered that orders him to cease and desist from engaging in activities in

violation of the Securities Act including Section 11-301, assesses a statutory penalty of up to

$5,000 per violation, permanently bars him from the securities and investment advisory business

in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so

engaged, and orders any other sanction or combination of sanctions as permitted under Section

11-701.1.

## COUNT III
### (Fraud in Investment Advisory Activities; Section 11-302)
### (Joe Karsner & Associates and Karsner)

WHEREAS, Section 11-302 of the Securities Act makes it unlawful for any person who

receives, directly or indirectly, any consideration from another person for advising the other

person as to the value of securities or their purchase or sale, or for acting as an investment

adviser or representative under Section 11-101(h) or (i) of the Securities Act to:

(1)    employ any device, scheme or artifice to defraud;

(2)    engage in any act, practice or course of business which operates or
       would operate as a fraud or deceit on the other person;

(3)    engage in dishonest or unethical practices as the Commissioner may define
       by rule; or

(4)    knowingly make any untrue statement of a material fact or omit to
       state a material fact necessary in order to make the statements
       made, in light of the circumstances under which they were made,
       not misleading; and

WHEREAS, the Securities Commissioner has defined by Rule .03B of the Code of

Maryland Regulations .02.02.05 ("COMAR") dishonest or unethical practices to include:

(1)    recommending to a client to whom investment services are provided the purchase,
       sale or exchange of any security without reasonable grounds to believe that the
       recommendation is suitable for the client on the basis of information furnished by
       the client after reasonable inquiry concerning the client's investment objectives,
       financial situation and needs, and any other information known or acquired by the
       investment adviser after reasonable examination of the client's financial records;

(2)    placing an order to purchase or sell a security for the account of a client without
       having obtained, in advance, the authority to do so;

(3)    lending money to a client;

(4)    misrepresenting to an advisory client or prospective advisory client the

21

qualifications of the investment adviser, or an investment adviser representative employed by or associated with the investment adviser, or misrepresenting the nature of the advisory services being offered or fees to be charged for that service or omitting to state a material fact necessary to make the statements made regarding qualifications, services, or fees, in light of the circumstances under which they are made, not misleading; or

(5)     guaranteeing a client that a certain or specific result will be achieved, for example, gain or no loss, as a result of the advice that will be rendered; and

WHEREAS, JK & A and Karsner engaged in dishonest or unethical practices, employed

a device, scheme or artifice to defraud and engaged in an act, practice or course of business

which operates or would operate as a fraud or deceit on the other person by, among other matters:

(1)     switching clients from one portfolio of mutual funds to another more risky portfolio and making investment recommendations to clients that were unsuitable;

(2)     completing multiple NAFs for clients without explaining to them the issues and changing their investment objectives and risk tolerance without adequate disclosure;

(3)     carrying out transactions without obtaining prior client authority;

(4)     guaranteeing clients a specific result and promising clients that they could live off their investment income for the rest of their lives; and

(5)     paying clients for costs they incurred, including sales fees and commissions, unanticipated taxes and investment principal for unauthorized transactions; and

WHEREAS, JK & A and Karsner omitted to state material facts, including but not

limited to the riskiness of the mutual funds that be recommended; and

WHEREAS, JK & A and Karsner made untrue statements of a material fact, including

but not limited to the promises that clients could live off their retirement funds until they died

and could earn a guaranteed 12% return on variable annuities, 7% return on fixed annuities and

4.5% return in a money market account; and

WHEREAS, Karsner breached his fiduciary duty as an investment adviser representative

22

to act primarily for the benefit of his clients,

NOW, THEREFORE, IT IS HEREBY ORDERED that JK & A and Karsner show cause why a final order should not be entered that orders them to cease and desist from engaging in activities in violation of the Securities Act including Section 11-302, assesses a statutory penalty of up to $5,000 per violation, permanently bars respondents from the securities and investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged, and orders any other sanction or combination of sanctions as permitted under Section 11-701.1.

## COUNT IV
### (Revocation of Registration – Section 11-412)
### (Respondents Karsner and Legacy)

WHEREAS, Section 11-412 of the Securities Act provides that the Commissioner by order may deny, suspend, or revoke any registration if the Commissioner finds that the order is in the public interest and that the applicant or registrant or, in the case of a broker-dealer or investment adviser, any partner, officer, or director, any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the broker-dealer or investment adviser,

|       |       |
|-------|-------|
| (a)(2) | has willfully violated or willfully failed to comply with any provisions of this title, a predecessor act, or any rule or order under this title or a predecessor act; |
| (a)(7) | has engaged in dishonest or unethical practices in the securities or investment advisory or any other financial services business; |
| (a)(9) | is not qualified on the basis of factors such as training, experience, and knowledge of the securities or investment advisory or any other financial services business; or |
| (a)(10) | has failed reasonably to supervise the broker-dealer's agents; |

23

WHEREAS, Karsner willfully violated or willfully failed to comply with sections 11-301, 11-302, and 11-401 of the Securities Act as detailed in this Order;

WHEREAS, respondents engaged in dishonest and unethical practices, as set forth in this Order;

WHEREAS, Karsner is not qualified on the basis of factors such as training, experience, and knowledge of the investment advisory business; and

WHEREAS, Legacy did not maintain a supervisory system reasonably designed to supervise its representatives and failed to implement its procedures so as reasonably to supervise Karsner,

NOW, THEREFORE, IT IS HEREBY ORDERED that respondents Karsner and Legacy show cause why a final order should not be entered that revokes their broker-dealer and broker-dealer agent registrations and orders any other sanction or combination of sanctions against them as permitted under Sections 11-412 and 11-701.1 of the Securities Act.

## REQUIREMENT OF ANSWER AND
## NOTICE OF OPPORTUNITY FOR HEARING

_____IT IS FURTHER ORDERED, pursuant to Section 11-701.1 of the Securities Act and COMAR 02.02.06.06, that each respondent shall file with the Securities Commissioner a written Answer to this Order within fifteen days of service of the Order. The Answer shall admit or deny each factual allegation in the Order and shall set forth affirmative defenses, if any. A respondent without knowledge or information sufficient to form a belief as to the truth of an allegation shall so state.

The Answer also shall indicate whether the respondent requests a hearing. A hearing to

24

determine whether the Order should be vacated, modified, or entered as final will be scheduled in this matter *if one is requested in writing.* Failure by any respondent to file a request for a hearing in this matter within fifteen days of receipt of the Order shall be deemed a waiver by that respondent of the right to such a hearing.

Failure to file an Answer, including a request for a hearing, shall result in entry of a final order:

(a) directing that respondent permanently cease and desist from violation of the Securities Act; and

(b) imposing a monetary penalty of up to $5,000 per violation of the Securities Act; and

(c) barring that respondent from engaging in the securities or investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged; and

(d) revoking that respondent's securities and investment advisory registrations.

**SO ORDERED:**

DATED:  March 19, 2007

_____/s/_____

Melanie Senter Lubin
Securities Commissioner

ADMINISTRATIVE PROCEEDING
BEFORE THE
MARYLAND SECURITIES COMMISSIONER

IN THE MATTER OF:                          *

JOSEPH R. KARSNER, IV,                     *        File No. 2002-0391

JOE KARSNER & ASSOCIATES, LLC              *

      and                                  *

LEGACY FINANCIAL SERVICES, INC.,           *

     Respondents.                           *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF COMPLIANCE WITH SECTION 11-802(b)

I hereby certify that, in accordance with section 11-802(b) of the Maryland Securities Act, Title 11, Corporations and Associations Article of the Annotated Code of Maryland, I have effected service upon the respondents, Joseph R. Karsner, IV, Joe Karsner & Associates, LLC and Legacy Financial Services, Inc. by serving the foregoing Order To Show Cause upon the Securities Commissioner, and then by sending a copy of the Order and notice of service by certified mail, return-receipt-requested, to the respondents at their last-known address.

Dated: March 19, 2007                          /s/
                                                 Lucy A. Cardwell

Subscribed and sworn to before me
this 19th day of March, 2007

            /s/
Notary Public
My Commission expires: _____

26